### INDIANA BELL TELEPHONE CO. v. PUBLIC SERVICE COMMISSION OF INDIANA et al.

(District Court, D. Indiana. May 19, 1924.)

Nos. 528 and 721.

**1. Telegraphs and telephones ⬮33(1)—Elements of rate base value.**

Consideration of condition of telephone company's property, actual construction conditions under which it was developed, and cost of material and labor is essential to determination of fair and reasonable value of property for rate-making purposes.

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Telegraphs and telephones** ⬳33(1)—Book costs cannot alone show fair rate base value.

Though book costs may aid in determining fair and reasonable rate base value, they cannot themselves show such value, because they do not reflect all relevant facts, so long as appreciation is element to be considered.

3. **Telegraphs and telephones** ⬳33(1)—Average labor and material costs properly considered in determining rate base value.

Five-year period from 1916 to 1920 *held* fair period in which to take average costs of labor and material in determining value of telephone company's property for rate-making purposes.

4. **Telegraphs and telephones** ⬳33(1)—Allowance for depreciation held too low, under "straight-line method;" distinguished from "accrued depreciation," "realized depreciation," and "net realized depreciation."

Where life of telephone company's plant was 16 years, which under "straight line" method would amount to annual depreciation of 6⅔ per cent., Public Service Commission's allowance of 4 per cent. was substantially below fair and reasonable rate, and company's rate of 6.09 per cent. was not subject to reduction; "straight line method" being based on number of years life of plant, "accrued depreciation" meaning average of consumption of property, "realized depreciation" meaning consumption of property which has come to pass by retirement, and "net realized depreciation" being remainder after deducting amount of salvage.

5. **Telegraphs and telephones** ⬳33(1)—Commission's finding operating expenses too high not warranted.

Finding of Public Service Commission that telephone company's operating expenses were too high, because of which it refused to allow the return ordinarily permitted economically operated utilities, *held* not supported by evidence.

6. **Telegraphs and telephones** ⬳33(1)—Reasonable rate required.

In entering public utility business, investors devote their property to sole purpose of performing public service, and government undertakes to require its people to pay reasonable rate for services.

7. **Telegraphs and telephones** ⬳33(1)—Fair rate defined.

Fair rate generally is such amount as would at time of inquiry induce investment of money in utility, and this may be determined by testimony showing rate that securities of like kind and character, command in market.

8. **Telegraphs and telephones** ⬳33(1)—Rate lower than reasonable rate confiscatory.

Where, after proper consideration of evidence, fair and reasonable rate of return is determined, such rate should be allowed, and any lower rate would be confiscatory.

9. **Telegraphs and telephones** ⬳33(1)—Reproduction cost element of rate base value.

Under Burns' Ann. St. Ind. 1914, § 10052i, in determining reproduction cost as rate base, money actually expended, which would not be included in inventory of physical property, should be included in construction costs.

10. **Telegraphs and telephones** ⬳33(1)—"Going value" held element of rate base value.

Public Service Commission's valuation of telephone company's property for rate base, without substantial allowance for "going value," on theory that going value was included in amount paid on plaintiff's purchase of property, held unwarranted.

11. **Telegraphs and telephones** ⬳33(1)—Amortization of difference between rates.

Where Public Service Commission stipulated to amortize any difference between rate subsequently established and rate in effect at time of first hearing, company was entitled to have such difference added to capital to be paid in five annual installments, without interest.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**12. Telegraphs and telephones ⊝⊳33(1)—Rental allowable for equipment under license contract.**

License contract, whereby telephone company paid another company, owning 98 per cent. of its stock, 4½ per cent. of its gross revenues as rent for equipment, was improperly disregarded by Public Service Commission, in fixing rates in absence of proof of fraud or unfairness.

**13. Commerce ⊝⊳10—Interstate Commerce Commission may not, under Transportation Act prescribe depreciation rate, except after investigation, and where it made no investigation state commission may fix rate.**

Under Transportation Act, § 435 (Comp. St. Ann. Supp. 1923, § 8592), the Interstate Commerce Commission may not prescribe depreciation rate for public utilities for other than bookkeeping and reporting purposes, except after investigation, and where it has made no investigation, and has fixed no rate proper for rate-making purposes, a state Public Service Commission has right to fix depreciation rate.

In Equity. Suit by the Indiana Bell Telephone Company against the Public Service Commission of Indiana and others. Decree for plaintiff.

Miller, Dailey & Thompson and Pickens, Moores, Davidson & Pickens, all of Indianapolis, Ind., for plaintiff.

Ralston, Gates, Lairy, Van Nuys & Barnard, U. S. Lesh, Edward M. White, and Shirley, Whitcomb & Dowden, all of Indianapolis, Ind., for defendants.

PAGE, Circuit Judge. This action is to enjoin, as confiscatory, the rate order made August 11, 1923, by the Public Service Commission of Indiana. Starting about 1883, one telephone system, covering Ohio, Indiana, and Illinois, was built up and operated until the Central Union Telephone Company, the then owner, on December 31, 1912, separated the properties in the several states, and the Central Union Telephone Company of Indiana received the Indiana property at a book valuation of $9,444,677.81. The Indiana company was under a receivership from 1914 until early in 1919. In 1918 an increase in the rates was asked, but before action was taken the United States government took over the lines and granted an increase in rates. After government control ceased, an increase in rates was asked, and on February 9, 1920, a small increase, much less than was asked, was given.

Plaintiff, in March, 1920, purchased the Central Union Telephone Company's Indiana properties, and on May 28, 1920, asked for an increase, which was refused because the commission took the position that the service was not in all respects satisfactory. Thereupon, before the hearing was completed, the petition was dismissed by plaintiff. Various applications were made for increase in rates during 1921 and 1922, and some relief in some instances was given. In June, 1922, the company filed a petition for general increase in rates, and on August 21st all increase as to the Indianapolis rates was denied.

Plaintiff on August 28, 1922, filed suit No. 528, charging confiscation of its property. On September 28, 1922, the commission gave notice that it would undertake a state-wide investigation of the reasonableness of plaintiff's telephone rates. Upon the hearing before three judges of the prayer for preliminary injunction in No. 528, it was

⊝⊳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

stipulated, in open court, that if no injunction was granted the commission would amortize the difference between any rates fixed and those then existing. The stipulation was approved, and no injunction was granted. On November 27, 1922, an investigation was commenced by the commission.

No order having been issued, plaintiff, on August 8, 1923, filed suit No. 721, averring that the rates in force in Indiana, other than those for Indianapolis, were confiscatory, and that the commission's delay in granting a new rate was unreasonable and arbitrary, and praying an injunction. Three days later the order now sought to be enjoined was entered, approving plaintiff's toll rates and granting an increase in some rates, leaving some untouched, and reducing others.

After amending bill in No. 721 and filing a second supplemental bill in No. 528, the cases were consolidated, and an interlocutory injunction was prayed and allowed pending final hearing.

Four contentions are made: (1) That the commission's property valuation is too low. (2) That the allowance of less than 4½ per cent., with which to pay plaintiff's obligation under the license contract with the American Telephone & Telegraph Company, is illegal. (3) That a 6 per cent. rate of return is too low. (4) That the 4 per cent. depreciation rate is too low.

Plaintiff found the minimum fair current cost value of its physical property to be $42,147,361.56. The commission's expert, Bemis, fixed the rate-making base at about $28,000,000. The public accountant, Herdrich, from an examination of book costs, found $31,370,500.08. The commission's engineering staff arrived at two sets of figures, $24,081,777 and $27,574,518, respectively, which the witness said, however, he did not claim represented the then present value of the property. The commission fixed the rate base value at $31,955,860,53.

Between the highest and the lowest valuation there is a difference of 45 per cent., or $19,000,000. The commission's value is $10,000,000 less than plaintiff's, and $8,000,000 higher than the lowest figure of the commission's engineers, and that low figure, in turn, is only $400,000 higher than the gross additions to plant from 1912 to 1922, as found by Bemis. Assuming that these conclusions were honestly arrived at, it seems quite evident that there is in such figures small security against confiscatory rates, little protection to the public against unfair charges for public service, and but meager ground for hope that the values of utility securities can be stabilized, or that confidence in the governmental function of rate making can be established, until some more certain method is found for arriving at rate base values.

### Increase in Value as an Element in Rate Making.

In here giving the results of my study of the record on the question of a fair rate base, I have attempted to follow the methods and include the elements of value that seem to be recognized by the authorities. Nevertheless, I believe that the inclusion for rate-making purposes of any increase in value of property occurring after it has been incorporated in the utility is fundamentally unsound, for many reasons.

First. Property must be used in the establishment, maintenance, and operation of every public utility, yet the thing sold to the public is service, and if property in the utility can in any sense be said to be given or devoted to public use, then it necessarily follows that it is given for the limited purpose of performing that service, and while incorporated in the utility can have no value beyond what it contributes to the rendition of that service.

Second. By the mere act of devoting property to the uses of a utility, in rendering a public service, the property loses its exchange value while it remains in the utility, and no market increase in value could possibly add one whit to the value of the service rendered. The public is not obligated to pay more than the reasonable value of the service.

Third. The public pays for all depreciation. If appreciation, through the increase of market values, is to be added in making the rate base, then the public pays, not only for appreciation, but for depreciation. In Ames v. Union Pac. Ry. Co. (C. C.) 64 Fed. 165, the method of arriving at the value of property for rate-making purposes is likened to that of arriving at the value in condemnation proceedings. Property in a public utility is not taken for a public use, as it is in condemnation. It is voluntarily devoted to the limited purpose of rendering a specified public service. Even in condemnation, if one's interest in property is limited, he can be compensated only for the value of that limited interest. 20 Corpus Juris, 740.

### The Property Rate Base Value.

The Indiana Public Service Commission came into existence on May 1, 1913, a few months after the separation of the properties. When the property was sold to the plaintiff, the book value was about $16,000,000. It was appraised in its then depreciated condition, as required by the rules of the Interstate Commerce Commission, at $20,-400,000, but the property was sold and was put upon the books at a valuation of $18,000,000. That sum, plus net cash additions after October 31, 1919, was found by the commission to be the then fair and reasonable value of the property by the commission's order of March 30, 1920. While the order reserved the right not to be bound by that finding, there is no evidence to contradict either the appraisal or the correctness of that finding.

The total capitalization on December 5, 1923, was $32,447,725, based presumably on sound values, found by the commission after investigation as provided by the statute. It is nearly $8,000,000 higher than the figures made by Carter, the chief of the commission's engineering staff, and nearly $5,000,000 higher than the value found by the commission's witness Bemis. To arrive at the fair value of property for a rate base, the courts have said:

"There must be a reasonable judgment, having its basis in a proper consideration of all relevant facts." Minnesota Rate Cases, 230 U. S. 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

In valuing a utility that has been built up through a long course of years, embracing some 70 exchanges, where repairs, renewals, de-

preciation, and withdrawals are going on constantly, there are necessarily many relevant facts that must be studied. After a careful consideration of the testimony given by Herdrich, Carter, and Bemis, witnesses for the commission, dealing with the question of the rate base value, I am confronted with the fact that neither Herdrich nor Bemis ever saw the plant, and that, although Carter had some familiarity with the property, he did not appraise, but merely inventoried it, and arrived at his figures by price curves, that did not involve the property condition. Apparently Carter was not acting upon his independent judgment, but merely produced figures by following a method directed by some one else. This conclusion is inevitable from the following question and answer:

"Q. I suppose you wanted to find * * * the value * * * of the property at the time the rate is to be made? A. I am not attempting in any of my figures to find the value. I am making my appraisals, using a certain series of figures."

Carter's curves show no actual prices, but only the trend of prices from the years 1911 to 1922. His utility curve was made by combining 30 points for metal and metal products, 11 points for Indianapolis union labor, and 1 point for lumber and building materials. A reference to the Carter curve chart will show that his utility property curve has peaks at the middle of 1917 and the middle of 1920, reaching nearly to the index figure 200, and those peaks correspond as to time very closely with the metal and metal products peak, which reached nearly 295 at the middle of 1917, and the lumber and building material peak, which reached 300 toward the middle of 1920.

Halstead introduced a chart, showing a cost curve, based on plaintiff's actual telephone construction costs, and upon that chart he reproduced the Carter utility curve. Nobody disputes the correctness of the Halstead curve. The Halstead chart shows that actual construction costs, at the beginning of 1916, were a trifle above 100. The Carter utility curve shows them above 120. At the middle of 1917, when the Carter utility curve showed close to 200, the actual construction costs were less than 130. From the middle of 1917, the Carter utility curve descended, and the actual construction costs curve ascended until the two crossed the line, at the beginning of 1919, at about 164. The actual construction costs continued to rise until they reached 200 at the middle of 1920, and remained on that level until the middle of 1921. The curve ends, at about the middle of 1922, at approximately 194. Where the two curves cross, at the beginning of 1919, the Carter curve descended to about 157 at the middle of 1919, and then paralleled in its ascent the Halstead curve until it reached, at the middle of 1920, about 193. The Carter curve then descended rapidly until the middle of 1921, where it was 146, and continued its descent until the middle of 1922, where it reached 137.

Halstead, as of November 1, 1922, made a valuation, on current cost basis, of the physical property, in its then condition, showing the property as of July 31, 1923. In the same manner, he made another valuation on a five-year average cost basis, 1916 to 1920, property as of July

31, 1923, and a third valuation on a ten-year average basis of 1913 to 1922. Nothing was added for going value or working capital. I have been much impressed by the fact that no witness in this case, other than those called on behalf of the plaintiff, has undertaken to make any analysis of the Halstead figures, and no one has made any direct attempt to contradict them.

Carter made his calculations on his 1913 to 1917 figures; that is, he started with prices that were nine years old when the commission's investigation started, and ended with prices that were five years old when the investigation started. Bemis testified that Carter should have taken only the property incorporated in the plant prior to 1917 at his 1913 to 1917 figures, and thereafter should have added all other property at current prices. Bemis, by that change and by adding construction in progress, materials and supplies, cash, and $400,000 for estimated additions to April 30, 1923 (which latter figures Bemis admits is several hundred thousand dollars too low), arrived at a value nearly $4,000,000 greater than the Carter so-called "present value" figures.

Although Bemis eliminated one vice in the Carter method, he adopted another, which I am of opinion made it impossible for him to arrive at a fair and reasonable value. He made no study of the property or of its condition. He wholly omitted, so far as the record shows, to include as one of the elements in his valuation, to give weight, or even consider a reasonable cost of bringing the property to its then state of efficiency, as provided by the Indiana statute. Bemis adopted the Carter price curves, that, in my opinion, were produced without regard to actual telephone construction costs.

[1] The condition of plaintiff's property was a relevant and an essential fact, and, without a study of that condition, I am of opinion that no fair conclusion could be reached as to the value of the property. Other relevant facts are contained in the record, viz. actual construction conditions under which plaintiff's property was developed; also, the cost prices paid by the plaintiff for material and labor. I am of opinion that those facts were essential and necessary in any attempt to arrive at a fair and reasonable rate base. All of those facts were open to the experts testifying on behalf of the defendants, and they made little or no study or use of them.

There are other matters in the record that seem to greatly detract from the value of the Bemis estimates. For instance, in Exhibit 34, he undertakes to use what he says is the book cost figures presented by Herdrich, viz. $25,500,000. Herdrich's figures most nearly resembling that amount show total of purchases and mergers in 1920, $25,814,798.03. Bemis again uses the erroneous figure of $400,000, appearing on the same exhibit and above referred to. In Exhibit 33, Bemis estimates that the revenue under the court order will be $10,014,339 from July 31, 1923, to same date, 1924. This figure was based solely upon the month of October, 1923, projected for 12 months. September, October, and November, 1923, are shown in the record, and both parties have, at my request, approved and furnished figures for December, January, February, and March, and agree that the seven months, projected for one year, show $9,803,323.32, which is only $1,613.28 higher than plaintiff's estimate at the hearing.

No one, on behalf of the commission, attempted to arrive at the reproduction cost, new, of the property. The public accountant Herdrich, formerly in the employ of the commission, made a book cost study for the last 10 years, ending December 31, 1922, and beginning with 1913, the year that the commission came into existence. For the first 30 years, covered by the operation of Ohio, Indiana, and Illinois as a unit, the records were not available. The witness Herdrich pretended to no skill, except that of an accountant. He said that there were doubtless many things shown on the books that plaintiff might consider relevant facts, but that his studies were made for the specific purpose disclosed in the nine sheets of Exhibit 31.

[2] To the purchase and merger costs, Herdrich added net additions from July 1, 1920, to July 31, 1923, arriving at a value of $31,-370,500,08. Book costs may, in many cases, aid in arriving at a fair and reasonable rate base value, but so long as appreciation remains an element to be considered in arriving at a value for rate-making purposes, book costs can never show a fair and reasonable value, because they do not reflect all the revelant facts necessary in arriving at a proper rate base. This is forcibly illustrated by the fact that Herdrich introduced a depreciation figure of 11 per cent., not because it appeared upon the books, but because the commission found, on the testimony of one of plaintiff's witnesses, that the property condition was 89 per cent. When asked if his figures, $25,814,798.03, showing the purchase and merger costs up to July 1, 1920, were undepreciated figures, he answered:

"There is an argument over that; part of it is undepreciated, and part of it, the company claims, has been depreciated."

Such evidence is too uncertain to be relied on, where there are millions involved in the depreciation figures. Herdrich was asked why he had not included anything for going value. He answered:

"The going value might be in the $31,371,000, and is, to some extent, in my opinion, on account of the increase in the book costs."

I am of opinion that such testimony should not be permitted to overcome the undisputed evidence that appraisal in 1920 was made of the property in its then depreciated condition without anything for going value, and the commission then found that nearly $2,500,000 less was a fair and reasonable price to pay for the property.

[3] The plaintiff urges as conservative its estimate of the cost of reproduction (less depreciation) of the physical plant in Indiana on a 5-year average cost basis, 1916 to 1920—$35,773,299.12. Its 10-year average cost basis—that is, 1913 to 1922—is $2,000,000 lower. The theory of appraisal covering a period of years, in opposition to an appraisal upon current prices, seems to have grown out of the belief on the part of commissions that, where there are rapid increases and decreases in values, a fair and reasonable value could only be arrived at by taking an average through a course of years. It appears that the Commission of Indiana formerly took 5 years, but now is using a 10-year average.

Carter's table shows that at the middle of 1922, Indianapolis union wages were more than 70 per cent. above such wages for 1914. While lumber, at the beginning of 1922, was a little below 160, it at the middle of 1922 was back to about 170, and at the end of 1922 was about 184. Carter showed all commodities at the middle of 1922 at about 150, and still rising: Metal and metal products from above 200, at the middle of 1920, had descended, early in 1922, to about 110; but at the middle of the third quarter of 1922 were up to about 135, and his utility curve, which is shown by the record to have less than a fair percentage of labor in its composition, ends at the beginning of 1922 at about 136, so these cost curves, as they end on the Carter chart, seem to corroborate the plaintiff's figures; that is, that the prices in 1922 were far above prewar prices.

I am of opinion that the five-year period from 1916 to 1920 was a fair period in which to take the average costs for the purpose of arriving at a rate base value in the telephone business.

### Depreciation.

[4] As to whether the rate of depreciation used by plaintiff in arriving at its base rate value was too high may be considered in connection with the whole question of depreciation. The record shows that for the months of September and October, 1923, the depreciation rate used was 6.09 per cent., and from April 1, 1920, to August 31, 1923, the rate prescribed by the commission was used, which resulted in a rate of 4.02 per cent. to 4.32 per cent.

There seems to be at this late date a considerable difference of opinion, or misunderstanding, as to what the purpose of depreciation is, and as to what it is. Some confusion has arisen in this case because the terms "straight line method," "sinking fund method," "accrued depreciation," "realized accrued depreciation," "net depreciation," etc., have been used.

By a study of the different elements entering into the make-up of a telephone property, it has been determined that the life of the plant as a whole is 15 or 16 years. Counsel for defendants in this case agree that it is approximately 16 years. From that experience, numerous commissions have adopted the straight line method (and all of the experts in this case say that it is the correct method), whereby there is set up every year the rate of depreciation, based upon the life of the plant as a whole, which, if the life was exactly 16 years, would make the rate 6.25 per cent. It is true, as counsel say, that the plant does not wear out in 16 years in actual service. That is not due, however, to the fact that it has a longer life, as a whole, but to the fact that it is habitually and constantly repaired.

"Accrued depreciation" has been defined in this case as the average of the consumption of property, and "realized depreciation" as that consumption of property which has come to pass by retirement. There is usually some salvage in the property retired, and the "net realized depreciation" is that depreciation which remains after deducting the amount of the salvage. The commission found that 4 per cent. was

a sufficiently high rate of depreciation. I find no evidence in this record that would support such conclusion.

Herdrich, in column C, sheet 7, of Exhibit 31, shows what the legend says is net charge to depreciation reserve for plant in service and furniture and fixtures, including extraordinary repairs, and finds that the average is 3.43 per cent. per year; but, as I understand, the legend under C, it does not correspond with his testimony, in which he says that C is net charge against reserve for plant removed, sold, or abandoned for the 10-year period. Much stress is laid upon the argument that here is an actual experience, showing less than 4 per cent. average depreciation for 10 years.

Inasmuch as the book account did not undertake to show anything more than net realized depreciation—that is, that part of the plant which had been removed, sold, or abandoned, less salvage—it is quite evident that that figure of 3.43 per cent., does not reflect the total depreciation, because it is within the common experience of every one that property in use is not removed, sold, or abandoned simply because it is some, or even much, depreciated. Ordinarily there is no removal, sale, or abandonment until it becomes substantially unfit for efficient use.

That 3.43 per cent. did not represent the true depreciated condition of the plant is evidenced by the fact that the plant was found by the commission to be in only 89 per cent. condition, and the witness Herdrich took off 11 per cent. additional, not found on the books, for the purpose of his computation. That alone would increase the average to more than an additional 1 per cent. for 10 years. If the plant life, as is agreed, is substantially 16 years, then the 4 per cent. rate of depreciation is very substantially below the fair and reasonable rate of depreciation, and the reproduction cost figures, found under the plaintiff's average cost price on a 5-year basis from 1916 to 1920, are not subject to reduction because of the use of too high a rate for depreciation.

### Rate of Return.

[5] While the commission found that it had ordinarily permitted economically operated utilities to earn a return of 7 per cent. or 8 per cent., and fixed the rate accordingly, they in this case fixed the rate of return at 6 per cent. Other than some general observations as to the study made by the commission of the reasons why it allowed less than what it ordinarily deemed a fair return, the action of the commission in that connection seems to be based upon the fact that it made comparisons between the operating costs of some 17 of plaintiff's exchanges and 11 independent exchanges, that were unfavorable to plaintiff. The witness who made the comparisons said that the towns were brought in comparison solely for the reason that the number of phones of the independent company in use in the towns brought into the comparison was comparable to the number of phones in use at plaintiff's exchange with which the independent was compared.

Upon the trial attention of counsel was repeatedly called to the fact that there were many other relevant facts necessary to be known and

considered before there could be any justifiable conclusion that plaintiff's operating costs were too high. To arrive at reasonable operating costs, it is just as important that all of the relevant facts shall be known as it is that all of the relevant facts shall be known in arriving at plant value. It seems not necessary to go into this question at any great length, but the commission's accountant Boggs introduced a number of exhibits, showing his comparisons. I will refer to but one comparison, Exhibit 22, where the number of stations varied from 2,216 to 2,560. All of the rates, we may presume, were either made or permitted by the commission.

Why the "subscribers' station revenues" should have been $15.96 at Rushville and $23.37 at Connorsville, both independent stations, there is nothing to show. Nor is there anything to show why "subscribers' station revenues" in the four cities occupied by plaintiff should have ranged from $20.10 to $24.48. While the message tolls in the independent cities were $1.90 and $2.78, respectively, in plaintiff's earnings they ranged from $4.12 to $7.81. Why the independent companies showed no earnings for three other items, and the plaintiff showed considerable earnings for each of those items, does not appear.

The maintenance expense at Rushville was $4.69, and at Connorsville it was $6.86, which was practically $1.50 higher than plaintiff's maintenance expense at New Castle and Shelbyville. The commercial expense at the Rushville plant was only 17 cents; at the Connorsville plant $1.41. That expense at plaintiff's exchange varied from $2.50 to $3.01. On the other hand, the general expense at Rushville and Connorsville was about equal, one being $2.51 and the other $2.65; while plaintiff's exchanges showed that the highest expense was $1.41 and the lowest $1.05. There was considerable variation in the taxes. With the exception of Shelbyville, the taxes of the independent companies were considerably lower than the taxes of the plaintiff.

The independent companies showed neither uncollectibles nor rents. All of plaintiff's exchanges showed uncollectibles, excepting Bedford, and all of them showed rent charges. Similar conditions obtained throughout the exhibits. In every exhibit the operators' wages paid by plaintiff were noticeably higher than such wages paid by the independent company. In several instances they were substantially double. I note one exception; Connorsville independent is higher than plaintiff's Crawfordsville station. But at New Castle plaintiff paid substantially four times the wages paid at Rushville. I especially note these facts because the commission, in its report, took occasion to say:

"The commission * * * does not criticize the wages paid by the company to its operators. It believes that these employés, considering the difficulties of their work and the close application required of them, are not overpaid."

Boggs' exhibits show that at the 11 independent companies there was an average for operators' wages of $4.77, whereas at the 17 company exchanges the average was $8.20, or nearly double. If the following conclusions arrived at by the commission are right, I am of opinion that there could have been no facts before the commission from

which it could fairly reach a conclusion that plaintiff's operating costs could or should be reduced, viz.:

"This evidence that Bell operating costs are in excess of the operating costs of the independents does not necessarily mean that the Bell exchanges are operated wastefully or extravagantly. The money is spent by the Bell in a systematic and orderly way, and accounted for by its accounting department in a manner that is near perfection. The trouble with the Bell costs is one common to huge organization, in that there is little individual responsibility."

I am not finding that plaintiff's operating costs were not too high, but I am finding that there is no evidence here, and there does not appear to have been any before the commission, to justify the commission's conclusion upon that point.

## What is a Confiscatory Rate?

[6] In determining the question as to whether a rate of return is confiscatory or not, many things must be considered. In entering upon the business of a public utility, there is an undertaking on the part of the investors who furnish the money necessary to establish the utility to devote their property to the sole purpose of performing the public service in question, and there is an undertaking on the part of the government to require its people to pay a reasonable return for that service.

[7] Leaving out of consideration the question of what may be in any given case, a fair return for the user to pay for a service, the fair return, generally speaking, is such an amount as would at the time of the inquiry induce the investment of money in such a utility. Money will not be invested in utilities unless the probable return will be at least equal to the return on securities of like kind and character; otherwise, many communities would be left without necessary utilities until they could be established under public ownership. One method of arriving at those conditions that would induce investment in public utilities is by testimony showing the rate that securities of like kind and character command in the market. Upon the hearing, the commission used Mr. Bemis to furnish such evidence, and from his testimony the court would be justified in arriving at the conclusion that a fair and reasonable rate of return would be considerably in excess of 8 per cent. on such an investment.

Exhibit 32, made by Mr. Bemis, shows that in the last 10 years there has been invested by plaintiff nearly $24,000,000, and that over $18,000,000 has been invested since January 1, 1917. Under date of March 30, 1920, the commission authorized plaintiff to sell, at not less than 98 per cent. of their face value, $11,000,000 of its three-year 7 per cent. notes. The commission thereby found that it was necessary and fair and reasonable to pay 7⅔ per cent. to induce the entry of that money into the utility. It at the same time authorized the assumption by the company of more than a half million dollars of first mortgage gold bonds, long outstanding against the South Bend Telephone Company. First mortgage bonds, inasmuch as they may exhaust the whole property, invite investment at a lower rate of interest than unsecured notes,

which, in their turn, may, as against the stockholder, exhaust the whole property; and preferred stock, in the form in which it is ordinarily issued, will invite investment at a lower rate than common stock. This conclusion is supported by all of the testimony in the case on the question of the relative value of securities.

[8] Some authorities seem to hold that although a rate may be lower than the facts in the case may possibly justify, yet that it may not be confiscatory. There may be conflict in evidence upon the question as to what will induce investment or money in utilities, and as to what is a fair and reasonable return thereon; but when all the evidence has had proper consideration and a rate of return arrived at, then unquestionably that rate of return should be allowed and any lower rate would be confiscatory.

### Going Value.

[9, 10] "Going value," used in connection with a public utility, is in my opinion a misnomer, because in a public utility the property has only its service value, and not any exchange value usual in properties not devoted to a service for a return limited to that which is fair and reasonable. But, in arriving at a reproduction cost, there are many necessary expenditures that are not reflected in an inventory of the physical property. Such expenditures should be included, as a part of reproduction cost. Any capable engineer or contractor can give a long list of such items that inescapably spell loss if omitted from construction costs. The Indiana Legislature must have had such items in mind when it provided that the commission should "give weight to the reasonable cost of bringing the property to its then state of efficiency." Burns' Stats. § 10052i. Such items represent money actually expended, and in no sense represent a profit or accretion to value.

Plaintiff's testimony here shows that 20 per cent. of the physical property value, or $7,154,659.80, is a fair going concern value. The commission rejected the allowance of anything for going value as follows:

"The evidence shows that the purchase price of $18,000,000, paid by the Indiana Bell Company to the Central Union for the telephone property in Indiana, did include a substantial sum to cover the element of going value. * * * The going value of this property, if it has any, would not be more than 5 per cent."

There is nothing before me to support any theory of 5 per cent, as the going value. Section 10052i of Burns' Ann. Indiana Statutes, revision of 1914, provides that:

"The commission shall value all the property of every public utility actually used and useful for the convenience of the public."

The Indiana statutes provide, in substance, that stocks, bonds, notes, etc., may only be issued under order of the commission, upon application of the utility, after a hearing, and then only for the property costs, etc., at their fair value. This record shows that on February 23, 1920, after the commission had been in operation for 7 years, and after the utility then owned by the Central Union Telephone Company and now

by plaintiff had for many years kept its books according to the commission's prescribed rules, the commission authorized the Central Union Telephone Company to sell, and plaintiff to buy, the physical property then owned by the Central Union Telephone Company for the sum of $17,450,700, plus the cost of net additions to such property since October 21, 1919, subject to the lien on said property of $549,300 of bonds. That authorized amount is the amount shown upon the books as paid by the plaintiff for the properties purchased. What further was contained in that order does not appear, but it does appear that on March 30, 1920, the order was modified in various ways, but the right to sell and purchase at the price originally stated was affirmed, and it appears that the appraised value of twenty million odd dollars, above herein referred to, was shown before the commission, and that the commission found that the purchase should be made for the $18,000,000, and the amended order recites:

"Which sum, for the purpose of this proceeding, the commission finds is a fair and reasonable value of such property and is a reasonable price to pay therefor, but which price, valuation or finding shall not be binding upon this commission or upon said Indiana Bell Telephone Company in any subsequent proceeding before the commission in which the value of the property in question may become material."

It also appears that the American Telephone & Telegraph Company was a joint petitioner with the Central Union and the plaintiff, and that it was then disclosed that it was the owner of 98 per cent. of the capital stock of the plaintiff. Even though it was permissible for the commission to make as a reservation the provision that neither party should be bound by the finding as to the property value, there is yet no evidence to show that the value there found to be the fair and reasonable value by the commission was not in fact the fair and reasonable value of the property; and even though some amount for going value was included in the sale price, there approved, of which fact I find no evidence, the record shows that nearly $9,000,000 was expended upon the properties during 1920, 1921, and 1922, and there is evidence to show that the expenditures of that money contributed to a higher state of efficiency in 1920, 1921, 1922, and 1923. I am of opinion that a substantial sum should have been added to the rate base value for that so-called going value.

### The $1,276,323.67 to be Paid in Five Years.

[11] The commission stipulated to amortize any difference between the rate established and the rate in effect at the time of the first hearing in this court. The amount so found for Indianapolis was $926,400, and for the balance of the state it was agreed that $349,923.67 should be added, making a total of $1,276,323.67. I am of opinion that if the Herdrich figure, $31,370,500.08, is to be used at all, there should have been added the above amount of $1,276,323.67, and that it should be paid in five annual installments, without interest. It was earned before the rate was made, and if it had been paid to the plaintiff as and when the finding of the commission is that it should have been paid it would have increased the plaintiff's assets by that amount.

A failure to add it to the capital will deprive plaintiff of any return on it after five years, until a new base rate is made, and of any per cent. that the final rate of return may exceed 6 per cent.

## The License Contract.

[12] The license contract obligated plaintiff to pay 4½ per cent. of its gross revenue to the American Telephone & Telegraph Company, in consideration for the furnishing by the latter company of receivers, transmitters, induction coils, etc. The commission allowed but $1 per station to plaintiff as an operating expense to pay its obligation under the license contract to the American Telephone & Telegraph Company, a reduction of $148,090 annually. The same contract has been before the courts many times and before the Supreme Court of the United States twice. It is my understanding that the holding of the Supreme Court is that the operating contracts of a utility must be accepted by the commission as it finds them, unless they are tainted by bad faith or fraud. City of Houston v. S. W. Bell Tel. Co., 259 U. S. 318, 42 Sup. Ct. 486, 66 L. Ed. 961; State of Missouri ex rel. S. W. Bell Tel. Co. v. Pub. Service Co. of Missouri, 262 U. S. 276, 288, 43 Sup. Ct. 544, 67 L. Ed. 981.

My own opinion is that the companies should be able to devise some better method of fixing the compensation than 4½ per cent. of the plaintiff's gross income. There is much in what the commission has said about the possibility of the compensation being greatly increased by additional gross returns without any additional service being rendered therefor, but it was within the power of the commission, in fixing its accounting rules, to require plaintiff to record upon its books and to disclose in its reports, with all reasonable detail, exactly what it received under that license contract, and then the value of the services and of the property supplied could have been determined according to ordinary rules if within the jurisdiction of the commission. The commission seems not to have required any such information. The evidence before the court wholly fails to show that there was any fraud or bad faith in making the license contract. The commission did not undertake to so find, unless this negative finding was intended to reflect such a conclusion:

"The evidence does not indicate that the officers of the Indiana Bell have exercised a proper discretion in the matter, for the reason that they had no discretion to exercise. The American Telephone & Telegraph Company, which completely owns and controls the Indiana Bell, prepared the contract, submitted it to the officers of the Indiana Bell, and they, as a matter of course, approved it."

That statement seems to have had for its sole foundation the relation of the parties by reason of the ownership of licensees' stock by licensor. The Supreme Court said that the ownership of the stock was unimportant, except to invite careful scrutiny, and, of course, if the scrutiny developed nothing more than the ownership of the stock, it would be traveling in circles to draw any further inference therefrom. I am of opinion that no fraud or unfairness has been shown to exist in the license contract.

### Jurisdiction of Commission over Depreciation Rate.

[13] Plaintiff urges that the commission was without jurisdiction to fix a rate of depreciation because it claims that that was a matter wholly within the jurisdiction of the Interstate Commerce Commission. I do not deem it necessary to go into the question of the relative rights of a state Public Utility Commission and of the Interstate Commerce Commission in regard to rate of depreciation, because I am satisfied that section 435 of the Transportation Act (Comp. St. Ann. Supp. 1923, § 8592), shown in Exhibit 21, contemplates that the commission shall only arrive at a proper rate of depreciation by some of the usual and well known methods of investigation, and that until it has done so it cannot prescribe a rate of depreciation for other than bookkeeping and reporting purposes.

The letter, notice, or order, whichever it may be termed, introduced in evidence, indicates that the Interstate Commerce Commission had not up to that time made any investigation or arrived at any rate which it deemed proper for rate making purposes, and that it had not, therefore, at the time the Indiana commission acted in this case, assumed any jurisdiction or control over telephone rate making that would deprive the Indiana commission of its undoubted right to fix a rate of depreciation, if not thus affected.

The following statements, one using the property value found by the commission and the other using the plaintiff's five-year average cost base, 1916 to 1920, seem to me to include additions that should be fairly made, and show the confiscatory character of the commission's order, without using at all many figures favorable to the plaintiff, sustained by much evidence in the record. These statements are made solely for the purpose of illustration:

| | | |
|---|---|---|
| Commission's valuation .................... | | $31,995,860.53 |
| *Amount of insufficient revenue from August 26, 1922, to September 1, 1923, found by commission to be .............................. | | 1,276,323.67 |
| Net additions May 1 to July 31, 1923.......... | | 306,678.46 |
| † 5 per cent. of $8,308,199, expended since 1920, purchase, as going value ................... | | 415,359.95 |
| | | $33,994,222.61 |
| A 6 per cent. return would be ............... | | 2,039,653.36 |
| Actual 1923 earnings ........................ | $8,243,195.10 | |
| Increase estimated by plaintiff under commission's order .............................. | 954,188.32 | |
| Add difference between 4 per cent. depreciation and depreciation shown 1923 ............... | 463,090.00 | |
| Add $148,000 difference in license payments over $1 per station ............................ | 148,090.00 | |
| | $9,808,563.42 | |
| Actual 1923 expenses ........... $7,784,136.62 | | |
| Wages increase ................. 162,000.00 | | |
| Five annual payments to repay, without interest, deficient revenue, as above ................. 255,264.73 | 8,201,401.35 | 1,607,162.07 |
| | $8,201,401.35 | $1,607,162.07 |

| | | |
|---|---:|---:|
| Taking plaintiff's 1916 to 1920 average as of July 31, 1923 ............................ | | $35,773,299.12 |
| Working capital ............................ | | 474,506.51 |
| † 5 per cent. for going value on additions to plant of 1920 purchase .................... | | 415,309.90 |
| | | $36,663.115.53 |
| A 6 per cent. return would be............... | | 2,199,786.93 |
| 1923 earnings ............................. | $8.243,195.10 | |
| Estimated increase ........................ | 954,188.32 | |
| Excess of 4 per cent. of depreciation in 1923 expense ..................................... | 357,332.00 | |
| Less difference on license by order .......... | 148,000.00 | |
| | $9,702,715.42 | |
| 1923 expense ................... $7,784,136.62 | | |
| Additional wages .............. 162,000.00 | | |
| To repay $1,276,323.67 in 5 payments ....................... 255,264.72 | 8,201,401.35 | 1,501,314.07 |
| | $1,501,314.07 | |

*Revenue deficiency allowed by commission.

† Commission said 5 per cent. was sufficient for going value. Plaintiff figures 20 per cent. as fair.

Neither statement includes income tax, $42,000; nor amount of obsolescence authorized to be amortized by commission order, $34,339.63; nor for increase in real estate value, $29,000.

I am of opinion that the injunction should be made permanent.