GILCHRIST ET AL., CONSTITUTING THE TRANSIT COMMISSION, ET AL. *v.* INTERBOROUGH RAPID TRANSIT COMPANY ET AL.

No. 159. Argued October 16, 17, 18, 1928. Reargued January 14, 15, 16, 1929.—Decided April 8, 1929.

· *Mr. Irwin Untermyer,*\* with whom *Messrs. Samuel Un-termyer* and *Charles Dickerman Williams* were on the brief, for appellant Transit Commission of New York.

---

\* *Mr. Irwin Untermyer,* for the Transit Commission, *Mr. Charles L. Craig,* for the City of New York, and *Messrs. William L. Ransom* and *George W. Wickersham,* for the Interborough and Manhattan Companies, participated in the first argument of the cause.

162

*Mr. Charles L. Craig,* with whom *Messrs. George P. Nicholson, Joseph A. Devery,* and *Edgar J. Kohler* were on the brief, for appellant City of New York.

176

*Messrs. Charles E. Hughes* and *William L. Ransom,* with whom *Messrs. James L. Quackenbush, Charles E. Hughes, Jr., Jacob H. Goetz, Harry L. Butler,* and *John Fletcher Caskey* were on the brief, for appellee Interborough Rapid Transit Company.

184

*Messrs. George Welwood Murray* and *William Roberts* were on the brief for appellee Manhattan Railway Company.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

This direct appeal is from an order of May 10, 1928, by the District Court, Southern District of New York, three judges sitting, which authorized an interlocutory injunc-

tion to restrain appellants—the Transit Commission and New York City—from requiring, or attempting to enforce, further acceptance by the Interborough Rapid Transit Company of a five cent passenger fare over the lines operated by it and from seeking to prevent a charge of seven cents. This Court stayed the order pending further hearing. The cause has been twice orally argued before us and helpful briefs are on file.

In support of the action below, appellees maintain:— The five cent fare originally stipulated and long observed had become non-compensatory. Although specified in the agreements with the City under which the transit lines are being operated, that fare was not immutable, since, by implication, provisions of the Public Service Law of 1907 directing that reasonable rates should be granted to subways, elevated and other street railways, were incorporated into the contracts. The Transit Commission in effect denied an application for compensatory rates, insisted upon observance of the five cent one and intended to take immediate steps to secure enforcement of it. This amounted to action by the State which would deprive the Interborough Company of property without due process of law, contrary to the Fourteenth Amendment.

The City of New York is a municipal corporation, whose charter vests control of streets and other executive powers in the Board of Estimate and Apportionment. The Transit Commission of three members created by Chap. 134, New York Laws, 1921, exercises powers theretofore entrusted to the Public Service Commission for the First District (Chap. 429, Laws, 1907) successor to the Board of Rapid Transit Railroad Commissioners organized under the Rapid Transit Act of 1891.

The Interborough Rapid Transit Company, a New York corporation, with $35,000,000 capital stock, operates elevated and subway lines in four boroughs of Greater

New York City. Some of these it owns; some the City owns and lets to it for operation; others—the original elevated lines—it hired in 1903 from the Manhattan Railway Company for 999 years, agreeing to pay therefor interest on $45,000,000 of outstanding bonds, 7% (now 5%) on $60,000,000 capital stock of the lessor and $35,000 annually for administrative expenses. At this time the total yearly payments for use of elevated lines is about $4,900,000.

Greater New York City contains five Boroughs—Manhattan, coterminous with Manhattan Island (ten miles long) with area of 19 square miles; The Bronx, 41 square miles; Queens, 117; Brooklyn, 80; and Richmond (Staten Island), 57. The population of the City in 1910 was 4,785,000 (in 1927, 5,970,000) of whom 2,330,000 resided within Manhattan, in the southern portion of which are located the great business centers of the Metropolitan district. The Bronx, on the mainland north of Harlem River, and Queens and Brooklyn on Long Island, have undergone very rapid development and increased greatly in population since 1900. The expanse of the Greater City, together with its peculiar physical characteristics, render exceedingly difficult any effort to provide rapid and cheap transportation for its residents and the crowds of outsiders who travel therein daily for business or pleasure. See *Sun Publishing Assn.* v. *The Mayor,* 152 N. Y. 257, 273.

Prior to 1903, under franchises dating from 1875, the Manhattan Railway, or its predecessors, constructed, owned and operated the four original elevated railway lines extending northward from South Ferry along Second, Third, Sixth and Ninth Avenues. All these were leased by the Interborough Company in 1903 and now constitute the oldest part of its system. Long before, and ever since, 1913 they have charged five cents per passenger, and from this the lessee for many years derived substantial net

profits. During 1910 and 1911 the average was $1,589,348.

The subway first constructed begins at City Hall, Manhattan, and extends northward to 96th St.—six miles.[1] From the latter point two branches diverge; one continues north across Harlem River to 230th St., in The Bronx— seven miles; the other (West Farms Branc ) runs northeast and under Harlem River to 182nd St. at Bronx Park— seven miles. These lines were constructed for the City, became its property and were let to the Interborough's assignor under "Contract No. 1," executed February 21, 1900,[2] and authorized by the Rapid Transit Act of 1891 as amended.

This contract—an elaborate instrument of 125 printed pages—provided with great detail that the lessee should equip and thereafter operate the road at its own expense under direction of the Board of Rapid Transit Railroad Commissioners; and further undertook to secure uninterrupted service. Among other things it declared—"The Contractor [Interborough's assignor] shall during the term of the Lease be entitled to charge for a single fare upon the Railroad the sum of five (5) cents, but not more. The Contractor may provide additional conveniences for such passengers as shall desire the same upon not to exceed one (1) car upon each train, and may collect from each passenger in such car a reasonable charge for such additional convenience furnished him, provided that the amount to be charged therefor and the character of such additional convenience shall from time to time be subject to the approval of the Board. The Contractor may provide not to exceed one (1) car in each train for persons smoking."

---

[1] These and similar figures are mere rough approximations.

[2] This and subsequent contracts designate agreements for operation as leases.

The lease was for fifty years (with right of renewal), the rent a sum equal to the annual interest on City bonds issued to secure the necessary funds for construction, plus one per centum for amortization. The lessee retained title to all equipment and the City agreed to purchase this at fair value when the lease ended.

Construction under Contract No. 1 cost the City around $60,000,000.[3]

By " Contract No. 2," dated July 21, 1902, the City contracted with the Interborough's assignor for the construction and operation during thirty-five years (with privilege of renewal) of an extension to the first subway, commencing at City Hall, Manhattan, and extending under East River to Borough Hall and thence to Atlantic Avenue, Brooklyn—4 miles. The lessee undertook to furnish equipment, act under direction of the Board of Rapid Transit Railroad Commissioners, and to pay for use of the lines a sum equal to the interest on bonds issued by the City to meet construction costs, plus one per centum ror amortization. Also, to carry out the proposal that passengers should have the right to transportation without change of cars and for a single fare not exceeding five cents for one continuous trip over the Railroad and connecting lines. A clause identical with the one above quoted from Contract No. 1 pre' ribed a five cent fare; another provision obligated the City to purchase the equipment when the lease terminated.

For the construction of this extension the City paid out $6,600,000.

Under Contracts 1 and 2, ways extending over approximately twenty-four miles (seventy-five of single track) were constructed and then equipped. The longest pos-

---

[3] These and similarly stated figures are intended only to give a fair idea of the problems presented—they do not indicate adjudication of any disputed question.

sible continuous trip by a passenger was 17.4 miles. For equipping them the lessee claims a capital investment of $60,000,000—but large items are questioned and the true sum may be less than $40,000,000. This equipment, with real estate valued at $300,000 and office sundries, is all the property connected with the subways which the Interborough now owns. The lines were opened for traffic October 27, 1904, and prior to 1919 their operation yielded annually large net profits.

The court below thought that, unless modified by Contract No. 3 (*infra*), Contracts Nos. 1 and 2 established an inflexible five cent fare, and this view has not been seriously questioned here.

In order to meet the insistent demand for quick transportation, after prolonged negotiations, the Public Service Commission, acting for the City with approval of the Board of Estimate (being specially authorized by the Rapid Transit Act as amended in 1912), entered into elaborate separate, but related, agreements (dated March 19, 1913) with the Interborough and Manhattan Companies for (1) the construction and operation of extensions to the old lines and certain new subways—" Contract No. 3;" (2) a third track on the elevated lines—" Third Track Certificate;" (3) extensions to the elevated lines—" Extension Certificate;" (4) for operation of elevated trains over designated portions of the new subways—" Supplementary Agreement."

Contract No. 3—122 printed pages—with great detail provided for immediate (and possible future) extensions of and additions to the subway system then existing, also their equipment and operation until the end of 1967. Under it the following lines were constructed, equipped and put into operation.* (1) From the end of old sub-

---

* These new lines in Brooklyn, Queens and The Bronx are mostly above ground.

way in Brooklyn eastwardly with two branches—nine miles. (2) From Borough Hall, Brooklyn, northwesterly under East River and lower Manhattan to Seventh Avenue and thence north to 42nd St. (Times Square)—six miles. (3) The Queensboro Bridge Line from Times Square eastward under 42nd St. through Steinway Tunnel under East River to Queensboro Bridge Plaza and beyond—12 miles. (4) From Grand Central Station northward along Lexington Avenue under the Harlem and beyond with two branches—eighteen miles. (5) An extension of West Farms Branch northward—five miles.

Fifty miles of subways were thus added to the original system—146.8 miles of single track. The longest distance between terminals became 26.78 miles. For the construction of these additions and extensions the City expended from its own treasury $113,000,000 and the Interborough Company advanced $58,000,000. For equipment the latter paid not above $62,000,000. Title to both road and equipment vested in the City and both were let to the Interborough Company until December 31, 1967, for operation in conjunction with the older subways. The lessee owns none of the equipment provided under this contract and is not obligated thereby to pay anything to the City as rental for the ways; but it did agree to make certain payments out of the earnings after named deductions are satisfied. The leases under Contracts 1 and 2 were adjusted to expire with 1967.

The following provisions of " Contract No. 3 " are of special importance here—

" Article I. . . . The City and the Lessee further agree upon the modification of Contract No. 1 and Contract No. 2 in the respects herein set forth, but nothing in this contract shall be construed as a modification or waiver of any of the rights or obligations of the respective parties under Contract No. 1 and Contract No. 2, except in the respect and to the extent herein specifically set forth."

[Certain modifications of Nos. 1 and 2 are specified but the five cent fare provisions are not mentioned.]

" Article III. This contract is made pursuant to the Rapid Transit Act which is to be deemed a part hereof as if incorporated herein."

" Article XLIX. . . . the gross receipts from whatever source derived directly or indirectly by the Lessee or on its behalf in any manner from, out of or in connection with the operation of the Railroad and the Existing Railroads [old subways] (hereinafter referred to as the ' revenue ') shall be combined during the term of this contract and the City shall receive for the use of the Railroad at the intervals provided a specified part or proportion of the income, earnings or profits of the Railroad and the Existing Railroads, . . ." [Broadly speaking, the part payable to the City is to be ascertained as follows: The Interborough Company shall deduct and retain each year sums sufficient to pay rentals on old lines required by Contracts 1 and 2 (say $3,000,000); taxes; operating expenses; maintenance; depreciation; $6,335,000, the estimated average profit derived during the years 1911–1912 from operation of the old lines under Contracts 1 and 2; 6% on $80,000,000 advanced for construction and paid for original equipment under Contract No. 3; interest on other cost of equipment. These are cumulative. Thereafter the City shall receive 8.76% on the cost of construction paid out under Contract No. 3. The remainder will be equally divided between the City and the Interborough.]

" Article LIV. The payment of the rental [to City] for the existing Railroads referred to in paragraph 1 (a) of Article XLIX shall be made as provided in Contract No. 1 and Contract No. 2 for the full term of such contracts as herein modified. . . ."

" Article LIX. The Lessee shall operate the Railroad [to be constructed] and the Existing Railroads [those

constructed under Contracts 1 and 2] as one complete system and shall furnish with respect thereto such service and facilities as shall be safe and adequate and in all respects just and reasonable. Free transfers shall be given, as required by the Commission . . . so as to afford a continuous trip in the same general direction for a single fare."

"Article LXII. The Lessee shall during the term of the contract be entitled to charge for a single fare upon the Railroad [to be constructed] and the Existing Railroads the sum of five (5) cents but not more."

"Article LXXVIII. Upon giving one year's notice in writing to the Lessee the City, acting by the Commission with the approval of the Board of Estimate, may terminate this contract as to all of the Railroad [to be constructed] (including Extensions and Additions) at any time after the expiration of ten (10) years from the date when operation of any part of the Railroad shall actually begin; or the City, acting by the Commission, upon like notice and with like approval may terminate [certain specified] portions thereof: . . ." [In the event of such termination the City agreed to pay the Lessee a varying per centum (never above 115%) of amounts contributed towards cost of construction or for equipment.]

The " Third Track Certificate " authorized the Manhattan Railway Company (owner of original elevated lines), subject to definitely prescribed conditions, terms and requirements, to lay third tracks on the Second, Third and Ninth Avenue Lines for accommodation of express trains.

The " Extension Certificate " authorized the Interborough Company to construct and operate four defined connections between the old elevated and the new subway lines. It carefully specified conditions intended to insure uninterrupted operation and protect the parties and contained the following clause—

" The Interborough Company shall be entitled to charge for a single fare for each passenger for one continuous trip in the same general direction over the Railroads (including the parts of the municipal railroad over which the Interborough Company is provided with trackage rights as in this Certificate provided) and the additional tracks (which shall mean the additional tracks authorized by the Commission by certificate to the Manhattan Railroad Company bearing even date herewith) and the Manhattan Railroad the sum of five (5) cents but not more. . . ."

There is also a provision for terminating the right to operate elevated trains over the extensions and additions and for taking them by the City upon payment of varying percentages of their cost, never exceeding 115%.

These extensions and connections rendered possible the operation of trains far beyond the original extremities of the old elevated lines over roads in the Boroughs of Queens and The Bronx belonging to the city.

By the " Supplementary Agreement," the City granted to the Interborough Company the right to use certain parts of subways constructed under Contract No. 3 in connection with the elevated roads, extended as above shown, and reserved as possible compensation a named per centum of any increased receipts.

January 1, 1919, all the lines, both elevated and subway, were constructed, equipped and in operation with uniform five cent fare.

The record indicates that when this suit was begun the City had expended from its own treasury for construction of subways $180,000,000; that the Interborough Company had advanced for such construction $58,000,000; and had expended for equipment not above $120,000,000—probably much less. The cost to the Interborough for laying third tracks on the elevated lines and building extensions thereto was $44,000,000. The original cost of the

old elevated lines is not disclosed and perhaps cannot be definitely ascertained; it did not exceed $90,000,000. Expenditures under Contract No. 3 greatly exceeded estimates; and the cost of operation has been much higher. The present values of the above-mentioned properties is very large, but to determine this with fair accuracy would be exceedingly difficult.

The following excerpts from an affidavit offered by the City are enlightening. The record supports the facts and figures used so far as here important; also in general the stated conclusions.

" The operation under Contract No. 3 has been highly profitable to the Interborough, as was the prior operation under Contracts Nos. 1 and 2. For the year ended June 30, 1926, the Interborough realized from the subway operation a net surplus of $6,569,573.03, after the payment of all operating expenses, taxes, interest and other fixed charges, including the rentals of $2,655,186.26 to the City under Contracts Nos. 1 and 2. The surplus is the amount available for the payment of dividends upon the capital stock of the Company so far as subway operation by itself is concerned. The amount of total capital stock outstanding is $35,000,000 . . . The subway earnings alone, therefore, under Contract No. 3, provide for dividend payments of over 18% on the par value of the stock . . .

" For 1927 the surplus amounted to $6,380,017.34. [The decline was due to a strike.]

" For the current fiscal year ended June 30, 1928, the figures for the first six months are available and show a net surplus amounting to $3,687,000, which exceeds the surplus for the corresponding six months of the fiscal year before by $1,609,000.

" These earnings are, of course, enormous and leave no room for claim that the five-cent fare fixed by Contract No. 3 is inadequate to give a fair return upon the investment of the Company in the subway properties, or

that the five cent fare is without due regard of the rights of the Company under the contract. . . .

" The financial difficulties of the Interborough during the past eight years, have been due to the elevated lease from the Manhattan Railroad Company, and not to the subway contract with the City. The terms of the elevated lease provide that the Interborough must pay as rental the interest upon the Manhattan Railway Company bonds outstanding and dividends after an initial period, at 7% upon the capital stock. The dividend rate, however, was adjusted in 1922 so that the Interborough is now paying 5% upon about 94% of the capital stock, only if and as earned by the Interborough, and 7% upon the minority interest. The Manhattan Railway Company bonds outstanding amount to about $45,000,000 and the capital stock to $60,000,000, . . . In 1927, the interest payments on the bonds amounted to $1,808,240 and the dividends on the stock to $3,086,756. In addition to these amounts, however, the Interborough must pay also interest and sinking fund charges on its own bonds and notes issued for the third tracking, the extension of the elevated lines, and other improvements. The total fixed charges resting on the elevated division, including the dividend rentals, amounted for the year ended June 30, 1926, to $8,062,274.85. The income above operating expenses and taxes available for these charges, was only $3,936,396.50. The net revenues from the elevated fell short of earning all charges, including the dividends to the Manhattan Railway stockholders, by $4,125,878.35. For the year ended June 30, 1927, the corresponding shortage amounted to $4,909,129.66.

" . . . The elevated and subway operations have been kept financially distinct. The revenues, expenses, taxes and fixed charges have been segregated, so that each system has had its own financial set-up under the contract controlling its operation. . . .

" Notwithstanding the extreme crowding which has existed for several years on the trunk subway lines, the number of passengers has increased steadily upon the subways, while on the elevated it has been decreasing. Since 1920 the transportation revenue [on subways] at a five cent fare has increased from $29,300,000 to $40,-731,000 in 1927. For the first six months of the current fiscal year, the subway revenue was $21,433,000, compared with $18,647,000 for the same six months the year before; the growth is still continuing unimpeded.

" On the elevated lines the total transportation revenues in 1920 amounted to $18,450,000 and for the year ended June 30, 1927, to $17,951,000. During the first six months of the current fiscal year the elevated transportation revenues were $8,874,000, compared with $9,098,000 for the same six months the year before. The decline has not stopped. . . ."

In 1891 the Legislature of New York enacted what is known as the " Rapid Transit Act " to " provide for Rapid Transit Railways in cities of over one million inhabitants," intended to meet the special needs of New York City, the only municipality with so large a population. It has been amended some forty times. Originally no provision permitted construction of railways at public expense—only privately-owned lines were contemplated. A Board of Rapid Transit Railroad Commissioners, with general supervisory powers over the construction and operation of rapid transit lines, was authorized and given authority to contract concerning fares; also to issue " extension certificates " upon such terms, conditions, and requirements as might appear just and proper. In 1894 an amendment directed that the question whether the City should construct rapid transit facilities at its own expense be submitted to the voters, and further provided—

" In case it shall be determined by vote of the people, as provided by Sections 12 and 13 of this Act, to construct

by and at the city's expense, then, and in that event, the road or roads so constructed shall be and remain the absolute property of the city so constructing it or them, and shall be and be deemed to be a part of the public streets and highways of said city, to be used and enjoyed by the public upon the payment of such fares and tolls and subject to such reasonable regulations as may be imposed and provided for by the Board of Rapid Transit Railway Commissioners. . . ."

" The said board for and on behalf of said city shall enter into a contract with any person, firm or corporation which in the opinion of said board shall be best qualified to fulfill and carry out said contract for the construction of such road or roads. . . ."

" Such contract shall also provide that the person, firm or corporation so contracting to construct said road or roads shall at his or its own cost and expense equip, maintain and operate said road or roads for a term of years to be specified in said contract not less than thirty-five nor more than fifty years and upon such terms and conditions as to the rates of fare to be charged and the character of service to be furnished and otherwise as said board shall deem to be best suited to the public interests and subject to such public supervision and to such conditions, regulations and requirements as may be determined upon by said board."

The voters approved the proposal. On February 21, 1900, and July 21, 1902, Contracts Nos. 1 and 2 were executed, and the lines therein specified were constructed and put into operation.

In 1906 the Rapid Transit Act was so amended as to require approval by the Board of Estimate and Apportionment of all contracts for construction, equipment, maintenance or operation of rapid transit railways built at public expense. Another amendment (Chap. 498, Laws of 1909) authorized the termination of operating contracts and the

taking by the City of the equipment upon payment of cost and not exceeding 15%. In 1912, as specially requested by the Board of Estimate and with full knowledge of the circumstances, the Legislature enacted the Wagner Bill which amended the Rapid Transit Act so as definitely to authorize the Contracts and Certificates, finally signed March 19, 1913 and above described, whose provisions, after long negotiations, had been tentatively agreed upon prior to the amendment—*Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110.

Concerning Extension Certificates Sec. 24 of the amended act declares—" 4. The certificate or certificates prepared by the commission as aforesaid when delivered and accepted by such person, firm or corporation shall be deemed to constitute a contract between the said city and said person, firm or corporation according to the terms of the said certificate; and such contract shall be enforceable by the commission acting in the name of and in behalf of the said city or by the said person, firm or corporation according to the terms thereof, but subject to the provisions of this act. . . ."

The Public Service Commission Law, entitled "An Act to establish the public service commissions and prescribing their powers and duties, and to provide for the regulation and control of certain public service corporations and making an appropriation therefor," Chap. 429, Laws of 1907, became effective July 1, 1907. It authorized appointment of two commissions and directed: " The jurisdiction, supervision, powers and duties of the public service commission in the first district [New York City] shall extend under this act: 1. To railroads and street railroads lying exclusively within that district, and to the persons or corporations owning, leasing, operating or controlling the same. . . ."

This is a general law relative to regulation and control of public utilities throughout the State. It contains no

words purporting to amend or modify the Rapid Transit Act except:—Those abolishing the Board of Rapid Transit Railroad Commissioners and directing that, in addition to other duties, ". . . the Commission in the First District shall have and exercise all the powers heretofore conferred upon the Board of Rapid Transit Railroad Commissioners under Chapter 4 of the Laws of 1891 entitled 'An Act to provide for rapid transit railways in cities of over one million inhabitants' and the Acts amendatory thereto." And, "All the powers and duties of such Board shall thereupon be exercised and performed by the Public Service Commission of the First District." Among other things it provides—

"SEC. 26. Safe and adequate service; just and reasonable charges.—Every corporation, person or common carrier performing a service designated in the preceding section [Railroads, Street Railroads and Common Carriers] shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such corporation, person or common carrier for the transportation of passengers, freight or property or for any service rendered or to be rendered in connection therewith, as defined in section two of this act, shall be just and reasonable and not more than allowed by law or by order of the commission having jurisdiction and made as authorized by this act . . ."

"SEC. 28. Every common carrier shall file with the commission having jurisdiction and shall print and keep open to public inspection schedules showing the rates, fares and charges for the transportation of passengers and property. . . ."

"SEC. 29. Unless the commission otherwise orders no change shall be made in any rate, fare or charge, or joint rate, fare or charge, which shall have been filed and published by a common carrier in compliance with the require-

ments of this chapter, except after thirty days' notice to the commission and publication for thirty days . . . The commission, for good cause shown, may allow changes in rates without requiring the thirty days' notice and publication herein provided for, . . . Whenever there shall be filed with the commission by any common carrier as defined in this act any schedule stating a new individual or joint rate, fare or charge . . . the commission shall have and it is hereby given authority, . . . upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, charge, fare, classification, regulation or practice; and pending such hearing and decision thereon, the commission upon filing with such schedule, and delivering to the carrier or carriers affected thereby, a statement in writing of its reasons for such suspension may suspend the operation of such schedule . . ."

" Sec. 49. 1. Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation . . . , or that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall . . . determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by general or special statute, and shall fix the same by order . . ."

No provision of the Rapid Transit Act subjects it to the Public Service Commission Law. An amendment to the Railroad Law (Chap. 481, Laws 1910) does this in respect of that enactment. *People ex rel. Ulster, etc. R. R. Co.* v. *Public Service Commission,* 171 App. Div. 607.

May 28, 1920, the Interborough Company, purporting
to proceed under Sec. 49, Public Service Law, complained
to the Commission that a five cent fare on the subways
was insufficient and asked a higher one. The petition was
denied "for want of jurisdiction to determine and fix
a rate of fare different from that fixed by Contract No.
3." A proceeding begun in a state court to annul this
order was discontinued before final hearing. Another
application—March, 1922—for increased fares upon both
elevated and subway lines was likewise denied for lack of
jurisdiction. No review was sought. In 1925 the Inter-
borough memorialized the Governor and Legislature, set
out the result of operations under the five cent fare, the
refusal of the Commission to grant any increase, and asked
relief. No action was taken upon this application.

February 1, 1928, the Interborough Company, adopting
the method prescribed by Sec. 29, Public Service Law, filed
with the Transit Commission new schedules which pur-
ported to establish, effective March 3, 1928, a seven cent
fare upon all its lines and requested permission to put
them into effect on five days' notice. Prior to February
14, 1928, the Commission took no official action. But, it
appears that counsel for the Commission and the Mayor
expressed the opinion that no relief should or would be
granted and perhaps used some threatening and ill-advised
language; also that the members of the Commission had
concluded no relief could be granted and that proceedings
should be begun at once in a State court to enforce observ-
ance of the contract rate.

At 9:20 A. M. February 14, 1928, the original bill now
before us was filed. It alleged the five cent rate had be-
come confiscatory, that the Commission had failed to
grant relief; and asked an injunction against any attempt
to enforce it, also against any interference with the es-
tablishment of a seven cent fare.

Later during the same morning the Transit Commis-
sion entered an order which denied its authority to grant

any new rate and rejected the new schedules. It further directed counsel to institute suits in the State court to prevent threatened violation of law by the Interborough Company through failure to observe the contract rate. Thereupon, being already prepared, three proceedings were begun.

On March 3, 1928, the Interborough Company filed a supplemental bill reciting the action taken by the Commission subsequent to the filing of the original bill, renewed the prayer for relief by injunction and especially asked that further prosecution of the proceedings in the State court be forbidden.

Voluminous affidavits were submitted by both sides, and upon these and the pleadings the District Court, three judges sitting, heard the cause and authorized the interlocutory injunction described above.

Considering the entire record, we think the challenged order was improvident and beyond the proper discretion of the Court.

The record is voluminous; the contracts between the parties are complex; the relevant statutes intricate. No decision of this Court or of any court of New York authoritatively determines the questions at issue. The basic one calls for construction of complicated State legislation.

To support the action of the court below it would be necessary to show with fair certainty, first, that before the original bill was filed the commission had taken, or was about to take, some improper action in respect of the Interborough Company's new schedules or its application for leave to discontinue the five cent rate and establish one of seven cents; and secondly, that the five cent fare was so low as to be confiscatory while the proposed charge of seven cents was reasonable. We think neither of these things adequately appears from the record.

At most, prior to the original bill, the Commission's members had accepted the view that it lacked jurisdiction

to permit a new rate because the existing one was irrevocably fixed by lawful contracts, and had determined promptly to seek enforcement of the City's supposed rights by proceedings in the State courts. This was neither arbitrary nor unreasonable. No ground existed for anticipating undue delay or hardship. The purpose of the Commission was in entire accord with rulings announced as early as 1920 and seemingly no longer controverted when, in 1925, the Interborough applied for legislative relief. There had been abundant opportunity to test the point of law by appeal to the State courts.

The power of the City to enter into contracts Nos. 1 and 2 was affirmed in *Sun Publishing Assn.* v. *The Mayor, supra;* likewise the validity of Contract No. 3 was declared in *Admiral Realty Co.* v. *City of New York, supra.* These cases point out that the object of those contracts was to secure the operation of railways properly declared by statute to be part of the public streets and highways and the absolute property of the City.

The statute under which the Interborough undertook to proceed gave thirty days after filing of the new schedules during which the Commission might take action. The effect of the contracts, long the subject of serious disputation, depended upon the proper construction of State statutes—a matter primarily for determination by the local courts. The members of the Commission intended to take official action appropriate to the circumstances, and neither what they did nor what they intended to do gave any adequate cause for complaint. Alleged newspaper stories and unbecoming declarations by counsel or City officials can not be regarded here as of grave importance.

Under the doctrine approved in *Prentis* v. *Atlantic Coast Line,* 211 U. S. 210, 231, and *Henderson Water Company* v. *Corporation Commission,* 269 U. S. 278, the Interborough Company could not have resorted to a federal court without first applying to the Commission as pre-

scribed by the statute. And having made such an application it could not defeat orderly action by alleging an intent to deny the relief sought.

Both the bill of complaint and the argument of counsel here proceed upon the theory that under the law of New York, as clearly interpreted by definite rulings of her courts, the contracts for operating the transit lines impose no inflexible rate of fare. With this postulate we cannot agree. *People ex rel. City of New York* v. *Nixon,* 229 N. Y. 356, decided July 7, 1920, is especially relied upon; but the circumstances there were radically different from those now presented. The effect of a contract with the City, expressly authorized by amendment to the Rapid Transit Act adopted subsequent to enactment of the Public Service Commission Law, was not involved. The court carefully limited its opinion. And it said: "The conditions of other franchises may supply elements of distinction which cannot be foreseen. Contracts made after the passage of the statute (Consol. Laws, ch. 48) [Public Service Commission Law] may conceivably be so related to earlier contracts either by words of reference or otherwise as to be subject to the same restrictions. We express no opinion upon these and like questions. They are mentioned only to exclude them from the scope of our decision. In deciding this case, we put our ruling upon the single ground that the franchise contract of October, 1912, was subject to the statute, and by the statute may now be changed."

Counsel for appellants refer with confidence to *Parker* v. *Elmira, C. & N. R. R. Co.,* 165 N. Y. 274; *Village of Fort Edwards* v. *Hudson Valley R. R.,* 192 N. Y. 139; *Matter of Quinby* v. *Public Service Commission,* 223 N. Y. 244; *People ex rel. Garrison* v. *Nixon,* 229 N. Y. 575, 645; *City of New York* v. *Brooklyn, etc.,* 232 N. Y. 463.

Although both the elevated and subway lines are operated by the same Company, the two systems have been

treated as separate and upon this record must be so regarded. The receipts from the subways show steady increase. If this continues, the Interborough Company ultimately will receive its entire investment on account of subways, with large profits. The elevated roads, the present value of which for rate making purposes is said to be above $150,000,000, are not prospering; their net receipts are diminishing. Appellees seek a seven cent fare for all lines based upon alleged present values and the requirements of a supposed unified system.

The claim for an eight per cent. return upon the values of subways, which are the property of the City and distinctly declared by statute to be public streets, *Sun Publishing Assn.* v. *The Mayor, supra,* is unprecedented and ought not to be accepted without more cogent support than the present record discloses. The operating equipment supplied under Contracts Nos. 1 and 2, which originally cost not over $60,000,000, real estate valued at $300,000 and office sundries of small value, is the only property connected with the subways to which the Interborough holds title; but it seeks remuneration based upon total values of all these ways and their equipment said to represent investments amounting to $360,000,000 and present value exceeding $600,000,000. At the current rate of return, after paying operating expenses, taxes, and rentals to the City, the Interborough will realize annually from the subways more than $17,000,000. The annual income of the elevated lines, after deducting operating expenses, maintenance, taxes, etc., probably will not hereafter exceed $4,000,000, and as the Interborough must pay rentals therefor amounting to $4,900,000, also interest on bonds, notes, etc., (issued for third tracks, extensions, etc.) in excess of $3,000,000, its loss by reason of this lease is heavy and apparently will increase.

During 1927, passengers carried on the subway lines numbered 814,600,000; on the elevated 359,000,000; total

1,173,600,000. An increase of two cents upon each fare would have added to the subway receipts $16,292,000; to the elevated $7,180,000.

The transit Commission has long held the view that it lacks power to change the five cent rate established by contract; and it intended to test this point of law by an immediate, orderly appeal to the courts of the State. This purpose should not be thwarted by an injunction. Upon the record before us we cannot accept the theory that the subways and elevated roads constitute a unified system for rate-making purposes. Considering the probable fair value of the subways and the current receipts therefrom no adequate basis is shown for claiming that the five cent rate is now confiscatory in respect of them. The action below was based upon supposed values and requirements of all lines operated by the Interborough Company treated as a unit; and the effort to support it here proceeds upon a like assumption.

The interlocutory order must be reversed. The cause will be remanded to the District Court for further proceedings in conformity with this opinion.

Mr. Justice Van Devanter, Mr. Justice Sutherland and Mr. Justice Butler dissent.