The **MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado corporation, Plaintiff,**

v.

The **PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO,** et al., **Defendants.**

**Civ. A. No. C-4009.**

United States District Court, D. Colorado.

July 5, 1972.

Laurence W. DeMuth, Jr., T. M. Ledingham, Akolt, Dick, Rovira, DeMuth & Eiberger, by Stuart S. Gunckel, Robert A. Dick, Denver, Colo., for plaintiff.

Duke W. Dunbar, Atty. Gen., by John E. Archibold, Irvin M. Kent, Asst. Attys. Gen., Denver, Colo., for defendants.

Kenneth G. Bueche, Gen. Counsel, Wheat Ridge, Colo., Gorsuch, Kirgis, Campbell, Walker & Grover, by Leonard M. Campbell, Howard J. Beck, Special Counsel, Denver, Colo., for the Colorado Municipal League.

Before DOYLE, Circuit Judge, and CHILSON and FINESILVER, District Judges.

### PER CURIAM

This is a utility rate case which is now in process before the Colorado Public Utilities Commission. Jurisdiction is asserted to exist on the basis of 28 U.S.C. § 1331, it being the contention of plaintiff that the refusal of the defendants to allow a temporary adjustment in plaintiff's telephone rates pending the decision of the Commission in the proceedings that are now going on constitutes a deprivation of property contrary to the Fourteenth Amendment of the Constitution of the United States. The demand is for a mandatory injunction directed to the Commission requiring it to immediately and forthwith allow Mountain Bell to increase its rates on an interim and temporary basis giving effect to its current operating and construction programs which are said to be, and no doubt are, extensive. Mountain Bell offers to deposit a bond to secure refunds should it be determined that the rates are excessive, unjust or unreasonable.

The central point in Mountain Bell's demand is that the defendant Commission has heretofore held that Mountain Bell is entitled to earnings and revenues which will insure a rate of 8.9 percent. It is said that under their current expansion and expenditure program their revenues have fallen below 8.9 percent, and even though they may be earning a substantial percentage, it nevertheless becomes a confiscatory rate if at any time their earnings fall below the fixed percentage previously determined to be reasonable. Thus, they maintain that any deviation from the 8.9 percent is per se confiscation and a violation of Mountain Bell's rights under the Fourteenth Amendment.

The present proceedings were instituted before the Commission in January 1972, and at that time a demand was

made to increase the rates on a temporary basis, but this request was denied. Subsequent similar requests were made and were also rejected by the Commission.[1] This action was filed May 16, 1972, no effort having been made to obtain relief in the courts of Colorado. The excuse given for this by-pass of state remedies on the part of Mountain Bell is that in a previous case, their 1971 rate case, they sought to obtain relief by applying for injunction in the state court. This request was denied and that denial was affirmed by the Colorado Supreme Court in Mountain States T. & T. Co. v. Public Utilities Com'n, Colo., 494 P.2d 76 (1972). Subsequent to the Commission's order in the 1971 rate case, Mountain Bell again prosecuted a proceeding through the state courts seeking various relief including recoupment of losses occurring during the interim period and demanding that their rates be increased to coincide with the current wage levels and additional capital losses (in other words, the current economic situation). Mountain Bell was denied relief at both the district and Supreme Court levels.

Mountain Bell points to these unsuccessful efforts as justifying its failure and refusal to seek a review of the defendant Commission's denial of its application to put into effect interim rates pending the 1972 determination.

As we view it, the crux of this controversy is then the alleged losses suffered by Mountain Bell during the rate-making process. A related problem is the utilization by the Commission of a historic period in determining rate base

and its refusal to adjust the rates on an entirely current basis, for example, month to month.

There is no complaint that the Public Utilities Commission has not been devoting its time and efforts to Mountain Bell's problems. The present hearings have been going on for some weeks, and it is predicted that they will continue until approximately July 15. After completion of these hearings, a prompt decision is likely because if no decision is forthcoming, Mountain Bell's requested increased rates will go into effect as a matter of law and regardless of decision.

■■ This court's jurisdiction is, of course, limited. It exists only to the extent that a federal question as described in 28 U.S.C. § 1331 exists. Thus, the matter must arise under the Constitution and laws or treaties of the United States. Clearly, we do not have plenary authority to adjust rates that we consider to be unfair; in short, we are not a rate-making authority and no amount of invective or characterization serves to create jurisdiction to grant relief. Congress, in 28 U.S.C. § 1342, has further restricted our jurisdiction in rate cases.[2] The narrow question is then whether there has been a violation of substantive due process and, if so, whether § 1342, *supra*, precludes our going forward. A reading of this specific statutory limitation clearly shows that we have jurisdiction to proceed only if part 4 of § 1342 requires it, that is, if nonexistence of a plain, speedy and efficient remedy in the courts of the state is shown. As we read the statute, its plain object is to prevent federal courts from intervening

---

1. The Commission suspended the operation of the rates in accordance with statutory authority, C.R.S.1963 § 115–6–11, which allows the filed schedule to be suspended pending hearing for 120 days plus an additional three months.

2. This section (the so-called Johnson Act of 1934) provides:

   The district courts shall not enjoin, suspended or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency

or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

in the state rate-making process even though the matter might be repugnant to the Federal Constitution, unless the remedy in state courts is inadequate.

## I.

■ Mountain Bell is certainly not without a formal remedy since the state machinery for review of Commission decisions is elaborate. C.R.S.1963 § 115–6–14(1) calls for a motion for rehearing within 20 days after a decision of the Commission. A failure on the part of the Commission to act on such a motion within 30 days constitutes a denial. Within 30 days after denial of the application for rehearing, the aggrieved party may apply to the state district court for a writ of certiorari for the purpose of "having the lawfulness of the final decision inquired into and determined." This is a review of the record made before the Commission. This section contemplates that the district judge hear and determine questions of law including Constitutional questions. The Supreme Court of Colorado then has jurisdiction by writ of error to review the district court's decision.

Section 115–6–17 requires that these actions be preferred over all other actions except election causes. There is no restriction as to the kind of decision that can be reviewed, and presumably a decision denying the application for immediate effectiveness of the rate schedule pending hearing, based as it is in this case particularly on the allegation that vast amounts are involved, could be reviewed. Thus, it is impossible to understand why Mountain Bell has failed to utilize this procedure and why it has allowed it to lapse. In fact, Mountain Bell did not try out this procedure in its 1971 rate case, but rather at the interim stages sought injunctive relief and, in-

deed, it came to this court in quest of such an injunction. See Mountain States Telephone and Telegraph Company v. Public Utilities Commission, 324 F.Supp. 857 (D.Colo.1971). On that occasion it sought to have the statute which authorizes suspension of interim rates declared unconstitutional, and it was also contending that the state process was inadequate during the interim period. However, this court did not reach these questions because a final decision of the Commission was entered on the day that the cause was tried.

Mountain Bell alleges, however, that the state machinery is inadequate because the Colorado law is committed to upholding the power of the Commission to suspend rates on an interim basis and until final adjudication, and thus it argues that federal court intervention is necessary if it is to have up-to-date, ongoing adjustments so as to continuously maintain the rate of return at the level below which it contends to be confiscatory. This contention goes far beyond anything which has previously been determined because it would allow a federal court of equity to intervene prior to the exhaustion of state remedies. The necessity for exhaustion of administrative remedies has long been recognized. Thus, in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908), it was held that an application for federal court injunction in a state rate case was premature prior to a review proceeding before the Supreme Court of Appeals in Virginia. It is to be noted that the court was authorized to substitute its decision for that of the Commission, but the case at the very least requires that the Commission shall be final and does not sanction federal court intervention while the administrative proceedings are in process.[3] Pro-

3. In holding that federal court intervention was not proper prior to completion of the legislative process, the Supreme Court through Mr. Justice Holmes said:
   The state of Virginia has endeavored to impose the highest safeguards possible upon the exercise of the great power

given to the State Corporation Commission, not only by the character of the members of that commission, but by making its decisions dependent upon the assent of the same historic body that is intrusted with the preservation of the most valued constitutional rights, if the

fessor Wright points out that the rationale for the rule is that until the administrative process is complete it is uncertain as to whether the party will need judicial relief. See Wright, Federal Courts, 2nd Ed., 187.

Mountain Bell would have us carve out a wholly new distinction based on the exigencies of the moment. This would, however, require us to, in effect, order the Commission to cease its present activities, that is, its efforts to determine permanent rates, and to turn to a hearing on temporary or interim rates first. That a hearing would be necessary is clear from Mountain Bell's prayer. This does not seek an order activating a particular rate schedule. Instead, it prays for a mandate directed to the Commission compelling it to put into effect rates which will guarantee Mountain Bell 8.9 percent return on a current basis. This could not be done without an extensive Commission hearing. Thus, if we were to grant this interim relief we would be compelling the Commission to carry out continuing or ongoing hearings and determinations increasing rates in an effort to keep Mountain Bell up to date. At the same time, we would have a permanent career, so to speak, reviewing the Commission's orders in an effort to ascertain whether the Commission had satisfied the court's mandate. This is contrary to both the letter and spirit of 28 U.S.C. § 1342.

The law does not require such interim intervention. The rate-making process involves instead a study of a particular period of experience and the fixing of rates in the light of this. It has not demanded continuous up to the minute adjustments even in a period of growth and expansion. Some delay is inevitable, but unless it is unreasonable, which it is not here, federal court intervention is not possible.

## II.

Apart from the question whether we lack jurisdiction in a procedural sense, we have grave doubts, which are apparent from the previous discussion, concerning whether Mountain Bell has made a showing of confiscation. In short, we disagree with the company's approach to the question as well as with its definition of the term.[4]

A threshold difficulty is that the rate-making process is complex in the extreme and for this court to determine that there is present confiscation would necessarily require consideration in some detail of the various items which have served to swell the rate base since the 1971 rates were set and to determine whether these expenditures are validly included in the present rate base. We are, of course, ill-equipped to make this kind of investigation, and we must defer to the Commission expertise. The present proceedings may yield decisions different from those made in connection with the 1971 rates both with respect to the composition of the rate base and the rate of return, but there is no reason to anticipate that the Commission's determinations will be either invalid or unfair.[5]

railroad see fit to appeal. It seems to us only a just recognition of the solicitude with which their rights have been guarded, that they should make sure that the state, in its final legislative action, would not respect what they think their rights to be, before resorting to the courts of the United States.

If the rate should be affirmed by the supreme court of appeals and the railroads still should regard it as confiscatory, it will be understood from what we have said that they will be at liberty then to renew their application to the circuit court, without fear of

being met by a plea of *res judicata*. It will not be necessary to wait for a prosecution by the commission. * * * 211 U.S. at 230, 29 S.Ct. at 71.

4. Obviously, we are not passing on the substantive merits of this question in that we are not considering the actual numbers involved; we consider only the applicable standards.

5. An example of both the complexity of rate making and the possibility of decisions different from those used in establishing prior rates was furnished by Public Utilities Commission Decision No.

■ Mountain Bell assumes that the figure 8.9 percent is an absolute and that the slightest departure from this level of return—even an infinitesimal fraction of a percentage point—is *per se* confiscatory and unconstitutional. But the cases do not support the company in this assertion. Rather the decisions recognize that the regulatory agency has some flexibility in fixing the rate of return—its decision being subject to existing economic conditions. This was recognized by the Supreme Court in a case relied on by Mountain Bell, Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The Court noted that the rate of return can be reasonable at one time and too high or low at another depending on economic conditions.[6]

It is not so much the rate of return being realized which shows confiscation but rather it is whether the rate being realized is just and reasonable. This was pointed out in Southern Bell Telephone & Telegraph Co. v. The Tennessee Public Service Commission, Tenn., 304 S.W.2d 640 (1957). The actual return was found to be 2.1 percent less than that set by the Commission as reasonable. The court wrote:

The Chancellor then, in this feature, concludes that merely because under the rate as fixed by the Commission does not yield 6.1% return [sic] does not necessarily mean it is confiscatory and unconstitutional. He correctly reasons that it is not the actual rate of the return which is being realized by the Company but whether or not the return that is being realized is just and reasonable for the Company under the proven circumstances. 304 S.W.2d at 647.

To the same effect is Pacific Tel. & Tel. Co. v. California Public Utilities Commission, 62 Cal.2d 634, 44 Cal.Rptr. 1, 401 P.2d 353 (1965).

■ The cases also recognize that the fixing of rates is a matter largely of prophecy and because of this commissions in carrying out their functions necessarily deal in what are called "zones of reasonableness" the result of which is that they have some latitude in exercising this most difficult function. See the Bluefield case, *supra*; New England T. & T. v. Mass. Dep't. of Public Util., 275 N.E.2d 493 (Mass.1971); Southwestern Bell Tel. Co. v. State Corp. Com'n., 192 Kan. 39, 386 P.2d 515 (1963) (pointing out that a court can in any event in evaluating rates only inter-

80636, issued June 26, 1972 while this matter was under consideration in this forum. In that Decision the Commission changed its previous position on three individual sections of the present tariff schedules, which changes are calculated to increase Mountain Bell's income in excess of $450,000 per year. That Decision points up the fact that the Public Utilities Commission is well equipped to continually consider rate modifications as business experience dictates.

6. The particular comments of the Supreme Court are as follows:
The company contends that the rate of return is too low and confiscatory. What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. *A rate of return may be reasonable at one time and become too high or low by changes affecting opportunities for investment, the money market and business conditions generally.* 43 S.Ct. at 679 (emphasis supplied).

fere at the high or low points of the zone of reasonableness); and New England Telephone and Telegraph Co. v. State, 104 N.H. 229, 183 A.2d 237 (1962) (pointing out that the state regulatory body has wide discretion within the "zone of reasonableness").

Mountain Bell cites numerous authorities, but places its main reliance on Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia, *supra,* Missouri ex. rel. Southwestern Bell v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923), and New England Telephone and Telegraph v. Department of Public Utilities, Mass., 275 N.E.2d 493 (Mass.1971). These cases, however, do not stand for the position of Mountain Bell. They do not hold that rates which have turned out to be less than the commissions' projections are *per se* confiscatory. In all of the cited cases, the respective courts were considering rates which had been finally determined. In *Bluefield* and *Southwestern Bell* the Court was not dealing with the *then* present condition. It was considering the actions of the rate-making bodies in failing to consider inflationary trends and in computing rate bases using reproduction cost less depreciation, a formula which is now discredited.

The New England case also was concerned with a full scale review of commission action. True, the court determined that the company was entitled to 11 percent of its equity (equivalent roughly to the 8.9 percent here); this could scarcely be considered as having universal application dependent as it is on surrounding facts.

■ As we view it then, for us to find that the present rate results in confiscation of the company's private property, we would have to make a finding based on evidence that the present rate is outside of the zone of reasonableness, and that its effects would be such that within the upcoming two months, until the Commission acts, the company would suffer financial disarray. Nothing bordering on this is apparent and it is doubtful whether it will come about. Thus, we would be unable to find a state of confiscation. There is not the slightest indication in the decisions that confiscation is to be adjudged on any instant basis.

### III.

■ The defendant Commission and intervenor also argue that this is a case in which the court should stay its hand until such time as the Commission has completed its proceedings and the Colorado courts have ruled on all of the questions and, particularly, the state law issues. Apart from other reasons, it would appear that the case is a proper one for the court in the exercise of the sound discretion which guides the determination of courts of equity to stay its hand.[7]

As was said by the Supreme Court in Railroad Commission of Texas, et al. v. Pullman Co., et al., 312 U.S. 496, 61 S. Ct. 643, 85 L.Ed. 971 (1941):

> \* \* \* Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Spielman Motor Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; or the administration of a specialized scheme for liquidating embarrassed business enterprises, Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A. L.R. 1166; or the final authority of a state court to interpret doubtful regulatory laws of the state, Gilchrist v. Interborough Co., 279 U.S. 159, 49 S. Ct. 282, 73 L.Ed. 652; cf. Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 243, 77 L.Ed. 610. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, "exercising a wise dis-

---

7. See Beal v. Missouri Pacific R. R., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941).

cretion", restrain their authority because of "scrupulous regard for the rightful independence of the state governments" and for the smooth working of the federal judiciary. See Cavanaugh v. Looney, 248 U.S. 453, 457, 39 S.Ct. 142, 143, 63 L.Ed. 354; Di Giovanni v. Camden Ins. Ass'n, 296 U.S. 64, 73, 56 S.Ct. 1, 5, 80 L.Ed. 47. This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers. Compare 37 Stat. 1013, 28 U.S.C.A. § 380; Judicial Code, § 24(1), as amended, 28 U. S.C. § 41(1), 28 U.S.C.A. § 41(1), 47 Stat. 70, 29 U.S.C. §§ 101–115, 29 U. S.C.A. §§ 101–115.

312 U.S. at 500, 501, 61 S.Ct. at 645. See also City of Meridian v. Southern Bell T. & T. Company, 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959), which holds that federal courts should not intervene until there has been an authoritative ruling in the state court as to the issue of state law.

In the case at bar there has been no effort to pursue the statutory remedy of review by certiorari in the state district court and in the Supreme Court, and at this time there is no clear ruling as to the policy of the Colorado courts on the question presented to us. In Alabama Public Service Commission v. Southern Railroad Company, 341 U.S. 341, 71 S. Ct. 762, 95 L.Ed. 1002 (1951), a situation almost exactly parallel to that presented here was before the Supreme Court. The suit, against the Alabama Public Service Commission, sought an injunction against the enforcing of Alabama laws prohibiting discontinuance of railroad passenger service. There, as here, the railroad contended that it was being compelled to operate its trains at a loss and that confiscation was the result. The majority opinion authored by Chief Justice Vinson noted

* * * that in passing upon similar contentions in the past, this Court has recognized that review of an order re-

quiring performance of a particular utility service, even at a pecuniary loss, is subject to considerations quite different from those involved when the return on the entire intrastate operations of a utility is drawn into question. Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 1907, 206 U.S. 1, 24–27, 27 S.Ct. 585, 593, 595, 51 L.Ed. 933. The problems raised by the discontinuance of trains Nos. 7 and 8 cannot be resolved alone by reference to appellee's loss in their operation but depend more upon the predominantly local factor of public need for the service rendered. Chesapeake & Ohio R. Co. v. Public Service Commission of West Virginia, 1917, 242 U.S. 603, 608, 37 S.Ct. 234, 236, 61 L.Ed. 520.

341 U.S. at 347, 71 S.Ct. at 767.

In denying relief the Supreme ·Court mentioned failure to exhaust state remedies, but finally concluded that relief should be denied because the federal courts were required to abstain. On this it was said:

As adequate state court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights. Equitable relief may be granted only when the District Court, in its sound discretion exercised with the "scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts," is convinced that the asserted federal right cannot be preserved except by granting the "extraordinary relief of an injunction in the federal courts." Considering that "[f]ew public· interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies," the usual rule of comity must govern the exercise of equitable jurisdiction by the District Court in this case. Whatever rights appellee may have are to be pursued through the state courts. Burford v. Sun Oil

Co., 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 1941, 311 U.S. 570, 577, 61 S.Ct. 343, 346, 85 L.Ed. 358; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L. Ed. 1368, as amended, 1940, 311 U.S. 614, 615, 61 S.Ct. 66, 85 L.Ed. 390.

341 U.S. at 349, 350, 71 S.Ct. at 768.

For the reasons stated—namely, the mandate of the Johnson Act, the failure to exhaust state remedies, the questionableness of the confiscation contention, and the inappropriateness of abstaining—we conclude that it would be highly improper for this court to interfere with these proceedings. Therefore, the case is lacking in merit, both legally and equitably.

Accordingly, the motion for preliminary injunction should be and the same is hereby denied.

CHILSON, District Judge (dissenting).

The plaintiff will be referred to as the "Company" and the Public Utilities Commission as the "Commission".

On October 1, 1970, the Company filed with the Commission, a revised draft of rates for the purpose of producing additional revenue, the rates to become effective December 7, 1970.

The Commission, exercising its statutory authority,[1] suspended the effective date of the rates for a period of 120 days.

On March 25, 1971, the Commission entered a final judgment (Decision No. 77230) with respect to the Company's application for a rate increase, in which the Commission determined the "fair" and "necessary" rate of return to the Company to be 8.9%. This determination was based upon the use of an historical test year period from November 1, 1969, to October 31, 1970. The Commission, in determining the rates to produce the 8.9% return, refused to consider the evidence offered by the Company that in the year, 1971, its wage rates and the investment per telephone installed would increase and that by virtue thereof, the rates established on the test year period would not be sufficient to provide the 8.9% return.

The Commission, in its Decision No. 77230, in explanation of its refusal to consider the Company's estimates of increased expenses and investment stated:

"We have held before, and now hold again, that once a correcting matching of revenues, expenses and investment in property is made, it is reasonable to assume that a projection of rates based on the test year conditions will continue to produce sufficient revenues in the future." (Page 15).

\* \* \*

"The company has, of course, maintained that in the year 1971, the relationship between revenues, expenses and rate base that existed during the test year, will not be maintained to the end that the Company's operating earnings will decline substantially." (Page 16).

The Commission replied to the Company's contention as follows:

"The rationale of using the past test year may be summarized as the Maine Commission did in Re Central Main Power Co., 29 PUR3d 113, 125:

'A test year is justified as a basis for forecast of future rate of return *on the assumption* that the growth of revenues and of income will tend to take care of the growth in the rate base; and that the factors which interfere with this corrective tendency can be allowed for by measurement or judgment.'" (Page 16). (Emphasis added.)

Admittedly, the "assumption" of the Commission, that the growth of revenues and of income would take care of the increased expenses and investment and return to the Company 8.9% return on its rate base, was not valid for the

---

1. 1963 C.R.S.—115-6-11.

year 1971, and, up to the present time, it is not disputed that the Company is presently earning substantially less than 8.9%.

It is admitted that the deficiency between the Company's earnings and the 8.9% return fixed by the Commission can never be recouped by the plaintiff and constitutes an irreparable loss, unless relief is granted by the Commission or a Court.

To prevent this irreparable loss, the Company on three occasions applied to the Commission asking for interim and temporary relief by permitting the Company to charge rates which would yield the 8.9% return which the Commission had fixed. The Company offered to collect the additional rates under bond and subject to refund should it later be determined that the Company was not entitled to the increase. These applications were denied by the Commission.

The so-called Johnson Act, 28 U.S.C. § 1342 provides:

"The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
\* \* \*

(4) A plain, speedy and efficient remedy may be had in the courts of such State."

If the Company has a plain, speedy, and efficient remedy in the courts of the State of Colorado, this Court is without jurisdiction to consider the Company's complaint and the action should be dismissed.

Although the statutes of the State of Colorado provide for a state district court review of any order or decision made by the Commission (1963 C.R.S. 115–6–14–15), the Colorado Supreme Court has restrictively construed these statutes.

In Mountain States T & T Co. v. Public Utilities Commission, Colo., 491 P.2d 582, the Company sought a preliminary injunction to enjoin the Commission from interfering with the charging of higher rates during the period of trial and appellate proceedings, the rates then presently fixed by the Commission being alleged to be confiscatory and therefore unconstitutional. The Colorado Supreme Court in denying injunctive relief stated:

"Even upon a substantial showing of probable success in ultimately establishing that the rate authorized is unjust, unreasonable, and even confiscatory, the sanction of any equitable relief should properly be directed to the administrative agency to permit and set such higher rates as will be deemed to be more consistent with fairness and reasonableness than the current rates under challenge."

The Company has applied to the administrative agency (the Commission) for relief and its application has been denied. Relief from this denial appears to be barred by the decision of the Colorado Supreme Court in Mountain States T & T Co. v. Public Utilities Commission, Colo., 494 P.2d 76. There the Company sought injunctive relief from the Commission's order refusing to permit an interim increase in telephone rates to be charged pending final determination of a request for a permanent rate increase. The Supreme Court stated:

"Where the statutory procedures before the PUC are not unduly delayed or prolonged, but progress on a prompt schedule as contemplated by law, a trial court should not intervene by entering an order requiring the higher rates requested by the utility pending final PUC determination."

In Public Utilities Commission v. Poudre Valley R. E. Association, Colo., 480 P.2d 106, the Colorado Supreme Court stated:

"Unless and until an administrative matter is reduced to a final judgment, settling all the issues between the parties, we will not review it."

We construe the foregoing decisions as prohibiting the state district courts

from reviewing the decision of the Commission denying the Company's applications for a temporary increase in rates to enable it to earn the 8.9% return which the Commission fixed and which, admittedly, the Company is not presently earning.

We conclude that in view of these decisions, it would have been a useless gesture for the Company to have applied to the state district court for relief.

We conclude that the Company has no plain, speedy or efficient remedy in the courts of the State of Colorado to adjudicate the merits of its claim that the present rates are confiscatory and are in violation of the Federal Constitution. Consequently, we conclude that this Court has jurisdiction of the subject matter of the complaint.

We now turn to the question of whether or not the Company is entitled to relief. It claims that the rates established and permitted to be charged by the Commission do not produce the 8.9% return, are confiscatory, and amount to the taking of the Company's property without due process of law in violation of the Fourteenth Amendment to the Federal Constitution.

As we have previously stated, it is admitted that the rates presently in effect do not earn 8.9% return which the Commission established as "fair" and "necessary". The verified complaint states that for the period from April 1, 1971, through December 31, 1971, the Company's revenues and earnings were over $12 million short of earning the 8.9% return.

The 8.9% return was established by the Commission after evidentiary hearings and a consideration of the factors involved in such a determination. (See Decision No. 77230). In these circumstances, the establishment of rates by the Commission which will not produce

the rate of return fixed by the Commission amounts to a confiscation of the Company's property in violation of the Fourteenth Amendment of the Federal Constitution.[2]

We hold the Company is entitled to injunctive relief fashioned to increase rates to produce the 8.9% return fixed by the Commission until such time as the Commission shall enter a final judgment in the rate proceedings presently before it, at which time the Company will have a plain, speedy and efficient remedy in the courts of the State of Colorado to review final judgment.

---

2. "There may be conflict in evidence upon the question as to what will induce investment or money in utilities, and as to what is a fair and reasonable return thereon; but when all the evidence has had proper consideration and a rate of return arrived at, then unquestionably that rate of return should be allowed and any lower rate would be confiscatory." Indiana Bell Telephone Co. v. Public Service Commission, 300 F. 190 (1924).